LIONEL Z. GLANCY (#134180)
ROBERT V. PRONGAY (#270796)
LESLEY F. PORTNOY (#304851)
CHARLES H. LINEHAN (#307439)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:   (310) 201-9150
Facsimile:    (310) 201-9160
Email: lportnoy@glancylaw.com

*Attorneys for Plaintiff*
[Additional Counsel On Signature Page]

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LIAM HARDY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>MABVAX THERAPEUTICS HOLDINGS, J. DAVID HANSEN, and GREGORY P. HANSON,<br><br>Defendants. | Case No.:   '18 CV 1160 BAS NLS<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>CLASS ACTION<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Liam Hardy, individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by MabVax Therapeutics Holdings ("MabVax" or the "Company"), as well as media and analyst reports about the Company and conference all transcripts. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of common stock of MabVax between March 14, 2016 and May 18, 2018, inclusive (the "Class Period"), alleging violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

2.      MabVax through its subsidiaries develops human antibody-based products and vaccines to address unmet medical needs for the treatment of diseases such as pancreatic, lung, sarcoma ovarian and breast cancer.

3.      On January 30, 2018, the Company filed an 8-K with the SEC disclosing an investigation by the SEC, the Company stated in relevant part:

MabVax Therapeutics Holdings, Inc. (NASDAQ: MBVX) ("MabVax" or the "Company"), a clinical-stage biotechnology company focused on the development of antibody-based products to address unmet medical needs in the treatment of cancer, today announced that it received notice that the Securities and Exchange Commission ("SEC") was conducting an investigation and examination pursuant to Section 8(e) of the Securities Act of 1933, as amended, relating to certain of the Company's registration statements (and amendments thereto). The Company intends to cooperate fully with the SEC's examination.

4.      On this news the Company's shares fell $0.47 per share, or nearly 18%, to close at $2.19 per share on January 30, 2018.

5.      Then, on May 21, 2018, the Company filed an 8-K with the SEC disclosing more details regarding the SEC investigation into the Company and its officers and directors' potential violation of federal securities laws, as well as an investigation into potential violations of securities laws by various holders of the Company's securities. The Company stated in relevant part:

We believe the SEC is investigating (i) potential violations by the Company and its officers, directors and others of Section 10(b) of the Securities and Exchange Act of 1934, as amended (as amended, the "Exchange Act") and Section 17(a) of the Securities Act of 1933, as amended (as amended, the "Securities Act"); and (ii) potential violations by multiple holders of our preferred stock of the reporting and disclosure requirements imposed by Section 13(d) of the Exchange Act and pursuant to Schedules 13D and 13G. We further believe the SEC Investigation pertains to our relationships with multiple of those holders of our preferred stock, including (i) the circumstances under which those stockholders invested in the Company and whether they have acted as an undisclosed group in connection with their investment; (ii) the manner with or in which those stockholders may have sought to control or influence the Company and its leadership since their respective investments (and the extent to which those efforts to control or influence have been

successful); and (iii) our prior disclosures regarding the control of the Company and beneficial ownership of our common and preferred stock included in our registration statements filed in 2017 and 2018 and in our Exchange Act reports. In light of the SEC Investigation, we have also reviewed facts and circumstances related to our recently completed May 2018 offering and publicly available information concerning certain of our stockholders' relationships with other registrants.

We have cooperated with the SEC in connection with the SEC Investigation, and our Board of Directors has appointed a Special Committee comprised of independent members of our Board of Directors to supervise the Company's review of the matters believed to be under investigation. However, we cannot predict when the SEC Investigation will conclude, nor whether it will conclude in a manner adverse to the Company, any of its directors and officers, or its current or former stockholders. We also cannot predict, how the SEC Investigation or any related matters may impact how the Company is perceived by the market, potential partners and potential investors in our securities. We do not believe that the SEC would declare effective any registration statements registering our securities effective during the pendency of the SEC Investigation.

Historically, we have calculated and reported beneficial ownership in reliance upon the accuracy of the beneficial ownership reporting of our stockholders, including reports filed on Schedules 13D and 13G and information provided by these stockholders directly to us. We have similarly relied on the accuracy of stockholder-reported beneficial ownership when effecting conversions of shares of preferred stock. The SEC Investigation and our review of the matters under investigation (including information learned recently) has raised questions about the accuracy of those reports by those holders, including their past disclaimers of having not acted as a group with respect to their investment in the Company. If certain stockholders have indeed acted as a group, their respective beneficial ownership interests should have been aggregated and reported in the aggregate in our prior beneficial ownership disclosures. If their holdings should have been so aggregated, then, due to the provisions of our organizational documents regarding the conversion limitations applicable to certain holders of our preferred stock, shares of our common stock may have been issued in violation of our

organizational documents. If shares of our common stock were issued in violation of our organizational documents, then the number of shares of our outstanding common stock previously reported in our financial statements, registration statements and Exchange Act Reports may be inaccurate. Further, figures reported and included in our financial statements, registration statements and Exchange Act Reports in reliance on the number of our outstanding shares of common stock, including, but not limited to, our loss per share figures, may also be inaccurate. We are also reviewing our internal and disclosure controls.

6.      On this news the Company's shares fell $0.41 per share or over 23%, to close on May 21, 2018 at $1.36 per share.

7.      Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose: (1) that the Company's internal controls over financial reporting were materially weak and deficient; (2) that the Company had incorrectly calculated and reported beneficial ownership of MabVax shares, and permitted improper influence or control over MabVax, and/or the Company's officers and directors by certain shareholders; and, (3) that, as a result of the foregoing, the Company's financial statements and Defendants' statements about MabVax's business, operations, and prospects, were materially false and misleading at all relevant times.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

9.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5. Jurisdiction is confirmed by §27 of the Exchange Act, 15 U.S.C. §78aa.

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

11.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). The acts and transactions giving rise to the violations of law complained of occurred and certain of MabVax's executive offices are located in this District.

12.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

13.     Plaintiff Liam Hardy purchased MabVax common stock during the Class Period as described in the Certification attached hereto and incorporated herein by reference and suffered damages.

14.     Defendant MabVax is a Delaware corporation with certain executive offices located in San Diego, California.  MabVax's stock trades on the NASDAQ under the ticker MBVX.  The Company's Annual Report filed with the SEC on

April 2, 2018 states that 8,961,840 shares of MabVax common stock were issued and outstanding as of April 2, 2018.

15.    Defendant J. David Hansen ("Hansen") is, and was at all relevant times, the Chief Executive Officer ("CEO"), President and Chairman of MabVax.

16.    Defendant Gregory P. Hanson ("Hanson") is, and was at all relevant times, the Chief Financial Officer ("CFO") of MabVax.

17.    During the Class Period, Defendants Hansen and Hanson oversaw the Company's operations and finances. Defendants Hansen and Hanson were intimately knowledgeable about all aspects of MabVax's financial and business operations and were also intimately involved in deciding which disclosures would be made by MabVax. Defendants Hansen and Hanson made various public statements for MabVax during the Class Period, and participated in Class Period investor conferences.

## DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS

18.    The Class Period starts on March 14, 2016, the date that MabVax filed its annual report for the period ended December 31, 2015, therein the Company discussed its "Financing Activities" and the effectiveness of MabVax's internal controls, stating in relevant part:

Financing Activities
Oxford Loan –On January 15, 2016, we entered into a Loan and Security Agreement with Oxford Finance LLC providing for senior secured term loans to us in the aggregate principal amount of up to

$10,000,000. On January 15, 2016, we received an initial loan of $5,000,000 under the Loan and Security Agreement.

Underwritten Offering –On September 30, 2015, we entered into an underwriting agreement with Laidlaw & Company (UK) Ltd. relating to the issuance and sale in a public offering of 2,500,000 shares of our common stock and 1,250,000 three-year warrants to purchase 1,250,000 shares of our common stock at an initial exercise price of $1.32 per share. The shares of common stock were sold at a public offering price of $1.10 per share and the warrants were sold at a price of $0.01 per warrant. The offering closed on October 5, 2015 with total gross proceeds to us of $2,750,000.

April Private Placement –On March 31, 2015 and April 10, 2015, we entered into separate subscription agreements with accredited investors relating to the issuance and sale of $11,714,498 of units at a purchase price of $0.75 per unit, with each unit consisting of one share of common stock (or, at the election of any investor who, as a result of receiving common stock would hold in excess of 4.99% of our issued and outstanding common stock, shares of our newly designated Series E Preferred Shares) and a thirty month warrant to purchase one half of one share of common stock at an initial exercise price of $1.50 per share (such sale and issuance, the "April Private Placement,"or the "Private Placement"). We conducted an initial closing of the April Private Placement on March 31, 2015 in which we sold an aggregate of $4,995,750 of units. Following the initial closing we entered into separate reconfirmation agreements with the investors in order to extend the initial closing date, increase the offering amount, and adopt a lockup agreement which was entered into by all investors who elected to continue their investment. A second closing was held on April 10, 2015 in which we entered into separate subscription agreements for the sale of an additional $6,718,751 of units.

On April 14, 2015, as a condition to participation by OPKO Health, Inc. ("OPKO") and Frost Gamma Investments Trust ("FGIT") in the April Private Placement, we entered into an Escrow Deposit Agreement with Signature Bank N.A. and OPKO, as amended on June 22, 2015, pursuant to which $3.5 million from the April Private Placement was deposited into and held at Signature Bank. The escrowed funds were released us on June 30, 2015 as part of a letter agreement giving OPKO the right, but not the obligation, until June

30, 2016, to nominate and have appointed up to two additional members of the our Board of Directors, or to approve the person(s) nominated by the Company. The nominees will be subject to satisfaction of standard corporate governance practices and any applicable national securities exchange requirements.

Preferred and Warrant Holders Common Stock Exchange Agreements –On March 25, 2015, we entered into separate exchange agreements (collectively, the "Exchange Agreements") with certain holders of our Series A-1 Preferred Stock and A-1 Warrants and holders of our Series B Preferred Stock and Series B Warrants, all previously issued by us. Pursuant to the Exchange Agreements, the holders exchanged their respective preferred shares and warrants and relinquished any and all other rights they may have pursuant to such securities, their respective governing agreements and certificates of designation, including any related registration rights, in exchange for an aggregate of 2,537,502 shares of our common stock and an aggregate of 238,156 shares of our newly designated Series D Convertible Preferred Stock (collectively the "Exchange Securities").

***

We conducted an evaluation of the effectiveness of internal control over financial reporting based on the framework in Internal Control — Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, our principal executive officer and principal financial officer conclude that, at December 31, 2015, our internal control over financial reporting was effective.

19.     On March 1, 2017, the Company MabVax filed its annual report for the period ended December 31, 2016, therein the Company discussed its "Financing Activities" and the effectiveness of MabVax's internal controls, stating in relevant part:

August Public Offering –On August 22, 2016, we closed a public offering of 1,297,038 shares of common stock and 665,281 shares of

Series F Convertible Preferred Stock ("Series F Preferred Stock"), and warrants to purchase 1,962,319 shares of common stock at $5.55 per share and warrants to purchase 1,962,319 shares of common stock at $6.29 per share, at an offering price of $4.81 per share. For every one share of common stock or Series F Preferred Stock sold, we issued one warrant to purchase one share of common stock at $5.55 per share and one warrant to purchase one share of common stock, warrant to purchase one share of common stock at $5.55 per share and one warrant to purchase one share of common stock at $6.29 per share. We received $9,438,753 in gross proceeds, before underwriting discounts and commissions and offering expenses totaling $871,305.

Oxford Loan –On January 15, 2016, we entered into a loan and security agreement with Oxford Finance LLC (the "Load and Security Agreement") providing for senior secured term loans to us in the aggregate principal amount of up to $10,000,000. On January 15, 2016, we received an initial loan of $5,000,000 under the Loan and Security Agreement. The option to draw the second $5,000,000 expired on September 30, 2016.

Underwritten Offering –On September 30, 2015, we entered into an underwriting agreement with Laidlaw & Company (UK) Ltd. relating to the issuance and sale in a public offering of 337,838 shares of our common stock and 168,919 three-year warrants to purchase 168,919 shares of our common stock at an initial exercise price of $9.77 per share (all numbers adjusted for the Listing Reverse Split). The shares of common stock were sold at a public offering price of $8.14 per share and the warrants were sold at a price of $0.01 per warrant (adjusted for the Listing Reverse Split). The offering closed on October 5, 2015 with total gross proceeds to us of $2,750,000.

April Private Placement –On March 31, 2015 and April 10, 2015, we entered into separate subscription agreements with accredited investors relating to the issuance and sale of $11,714,498 of units at a purchase price of $5.55 per unit (adjusted for the Listing Reverse Split), with each unit consisting of one share of common stock (or, at the election of any investor who, as a result of receiving common stock would hold in excess of 4.99% of our issued and outstanding common stock, shares of our newly designated Series E Convertible Preferred Stock ("Series E Preferred Stock")) and a thirty-month warrant to purchase one half of one share of common stock at an

initial exercise price of $11.10 per share (adjusted for the Listing Reverse Split), such sale and issuance, the "April Private Placement,"or the "Private Placement"). We conducted an initial closing of the April Private Placement on March 31, 2015, in which we sold an aggregate of $4,995,750 of units.

Following the initial closing we entered into separate reconfirmation agreements with the investors in order to extend the initial closing date, increase the offering amount, and adopt a lockup agreement which was entered into by all investors who elected to continue their investment. A second closing was held on April 10, 2015 in which we entered into separate subscription agreements for the sale of an additional $6,718,751 of units.

On April 14, 2015, as a condition to participation by OPKO Health, Inc. ("OPKO") and Frost Gamma Investments Trust ("FGIT") in the April Private Placement, we entered into an Escrow Deposit Agreement with Signature Bank N.A. and OPKO, as amended on June 22, 2015, pursuant to which $3.5 million from the April Private Placement was deposited into and held at Signature Bank. The escrowed funds were released to us on June 30, 2015, as part of a letter agreement giving OPKO the right, but not the obligation until June 30, 2016, to nominate and have appointed up to two additional members of our Board of Directors, or to approve the person(s) nominated by the Company. The nominees selected were required to meet certain standard corporate governance practices and applicable national securities exchange requirements.

Preferred and Warrant Holders Common Stock Exchange Agreements –On March 25, 2015, we entered into separate exchange agreements (collectively, the "Exchange Agreements") with certain holders of our Series A-1 Convertible Preferred Stock ("Series A-1 Preferred Stock") and A-1 Warrants and holders of our Series B Convertible Preferred Stock ("Series B Preferred Stock") and Series B Warrants, all previously issued by us. Pursuant to the Exchange Agreements, the holders exchanged their respective preferred shares and warrants and relinquished any and all other rights they may have pursuant to such securities, their respective governing agreements and certificates of designation, including any related registration rights, in exchange for an aggregate of 342,906 shares of our common stock (adjusted for the Listing Reverse Split) and an aggregate of 238,156 shares of our

newly designated Series D Convertible Preferred Stock ("Series D referred Stock"and, collectively, the "Exchange Securities").

\*\*\*

We conducted an evaluation of the effectiveness of internal control over financial reporting based on the framework in Internal Control — Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commis s ion. Based on this evaluation, our principal executive officer and principal financial officer conclude that, at December 31, 2016, our internal controls over financial reporting were effective.

**The Truth Partially Disclosed**

20.     The statements referenced above in ¶¶ 18 & 19 were materially false and/or misleading when made because Defendants failed to disclose: (1) that the Company's internal controls over financial reporting were materially weak and deficient; (2) that the Company had incorrectly calculated and reported beneficial ownership of MabVax shares and permitted improper influence or control over MabVax, and/or the Company's officers and directors by certain shareholders; and, (3) that, as a result of the foregoing, the Company's financial statements and Defendants' statements about MabVax's business, operations, and prospects, were materially false and misleading at all relevant times.

**The Truth Partially Revealed**

21.     On January 30, 2018, the Company filed an 8-K with the SEC disclosing an investigation by the SEC, the Company stated in relevant part:

MabVax Therapeutics Holdings, Inc. (NASDAQ: MBVX) ("MabVax" or the "Company"), a clinical-stage biotechnology

company focused on the development of antibody-based products to address unmet medical needs in the treatment of cancer, today announced that it received notice that the Securities and Exchange Commission ("SEC") was conducting an investigation and examination pursuant to Section 8(e) of the Securities Act of 1933, as amended, relating to certain of the Company's registration statements (and amendments thereto). The Company intends to cooperate fully with the SEC's examination.

22.     On this news the Company's shares fell $0.47 per share, or nearly 18%, to close at $2.19 per share on January 30, 2018.

23.     On April 2, 2018, the Company MabVax filed its annual report for the period ended December 31, 2017, therein the Company discussed its "Financing Activities" and the effectiveness of MabVax's internal controls, stating in relevant part:

**Conversion of Preferred Stock into Common Stock**
During 2017 holders of Series D Preferred Stock converted 88,384 shares into 398,131 shares of common stock, holders of Series I Preferred Stock converted 1,170,204 shares into 390,068 shares of common stock, holders of Series J Preferred Stock converted 1,614 shares into 537,874 shares of common stock and holders of Series K Preferred Stock converted 1,850 shares into 61,667 shares of common stock.

**Exchange of Series F Preferred Stock, Series G Preferred Stock and Series H Preferred Stock into Series L Preferred Stock**

On October 18, 2017, we entered into exchange agreements (each, an "Exchange Agreement"and collectively, the "Exchange Agreements") with the holders of all of the Company's outstanding shares of Series F Preferred Stock, Series G Preferred Stock and Series H Preferred Stock, pursuant to which 665,281 shares of Series F Preferred Stock, 1,000,000 shares of Series G Preferred Stock and 850 shares of Series H Preferred Stock were exchanged for 58,000 newly authorized shares of Series L Preferred Stock convertible into 3,222,223 shares of

common stock (the "Conversion Shares"). In connection with the Exchange Agreement the Company became obligated to schedule and hold a special meeting of the stockholders of the Company within 60 days of the date of signing the Exchange Agreement, at which time the Company shall present to its stockholders a proposal for approval of the potential issuance of up to an aggregate of 3,222,223 shares of common stock, in excess of 19.99% of the number of shares of common stock that were issued and outstanding on October 17, 2017, upon the conversion of 58,000 shares of the Series L Preferred Stock issued to the holders pursuant to the Exchange Agreements. On December 1, 2017, the stockholders approved the number of shares underlying the Series L Preferred Stock upon conversion.

On December 21, 2017, following the completion of the exchange of Series L Preferred Stock for all outstanding Series F Preferred Stock, Series G Preferred Stock and Series H Preferred Stock and related documentation, The Company filed with the Secretary of State of the State of Delaware a Certificates of Elimination eliminating from its Amended and Restated Certificate of Incorporation the designation of shares of its preferred stock as Series F Preferred Stock, Series G Preferred Stock and Series H Preferred Stock. As a result, all shares of preferred stock previously designated as Series F, Series G and Series H Preferred Stock were eliminated and returned to the status of authorized but unissued shares of preferred stock, without designation.

**Series D Preferred Stock**
As of December 31, 2017 and 2016, there were 44,104 and 132,489 shares of Series D Preferred Stock issued and outstanding, respectively. Shares outstanding as of December 31, 2017 and 2016 were convertible into 198,667 and 596,798 shares of common stock, respectively.

As contemplated by the exchange agreements and as approved by the Company's Board of Directors, the Company filed with the Secretary of State of the State of Delaware a Certificate of Designation of Preferences, Rights and Limitations of Series D Convertible Preferred Stock (the "Series D Certificate of Designations"), on March 25, 2015. Pursuant to the Series D Certificate of Designations, the Company designated 1,000,000 shares of its blank check preferred stock as Series D Preferred Stock. Each share of Series D Preferred Stock has a stated value of $0.01 per share. In the event of a

liquidation, dissolution or winding up of the Company, each share of Series D Preferred Stock will be entitled to a per share preferential payment equal to the par value. Each share of Series D Preferred Stock is convertible into 4.5045 shares of common stock. The conversion ratio is subject to adjustment in the event of stock splits, stock dividends, combination of shares and similar recapitalization transactions. The Company is prohibited from effecting the conversion of the Series D Preferred Stock to the extent that, as a result of such conversion, the holder beneficially would own more than 4.99% (provided that certain investors elected to block their beneficial ownership initially at 2.49% in the exchange agreements ), in the aggregate, of the issued and outstanding shares of the Company's common stock calculated immediately after giving effect to the issuance of shares of common stock upon the conversion of the Series D Preferred Stock. Each share of Series D Preferred Stock entitles the holder to vote on all matters voted on by holders of common stock. With respect to any such vote, each share of Series D Preferred Stock entitles the holder to cast such number of votes equal to the number of shares of common stock such shares of Series D Preferred Stock are convertible into at such time, but not in excess of the beneficial ownership limitations.

**Series E Preferred Stock**
As of December 31, 2017, and 2016, there were 33,333 shares of Series E Preferred Stock issued and outstanding, convertible into 173,251 shares of common stock.

On March 30, 2015, the Company filed with the Secretary of State of the State of Delaware a Certificate of Designation of Preferences, Rights and Limitations of Series E Convertible Preferred Stock (the "Series E Certificate of Designations") to designate 100,000 shares of its blank check preferred stock as Series E Preferred Stock.

The shares of Series E Preferred Stock are convertible into shares of common stock based on a conversion calculation equal to the stated value of such preferred share, plus all accrued and unpaid dividends, if any, on such share of Series E Preferred Stock, as of such date of determination, divided by the conversion price. The stated value of each share of Series E Preferred Stock is $75 and the initial conversion price is $16.65 per share, each subject to adjustment for stock splits, stock dividends, recapitalizations, combinations,

subdivisions or other similar events. In addition, during the period proscribed for in the Series E Certificate of Designations, in the event the Company issues or sells, or is deemed to issue or sell, shares of common stock at a per share price that is less than the conversion price then in effect, the conversion price shall be reduced to such lower price, subject to certain exceptions. The Company is prohibited from effecting a conversion of the share of Series E Preferred Stock to the extent that, as a result of such conversion, such holder would beneficially own more than 4.99% of the number of shares of common stock outstanding immediately after giving effect to the issuance of shares of common stock upon conversion of the Series E Preferred Stock, which beneficial ownership limitation may be increased by the holder up to, but not exceeding, 9.99%. Each holder is entitled to vote on all matters submitted to stockholders of the Company and shall have the number of votes equal to the number of shares of common stock issuable upon conversion of such holder's share of Series E Preferred Stock, but not in excess of beneficial ownership limitations. The shares of Series E Preferred Stock bear no interest.

On August 22, 2016, when the Company closed on the August 2016 Public Offering, the current Series E Preferred Stock conversion price of $16.65 per share was reduced to $14.43 per share under the terms of the Series E Certificate of Designations, resulting in an increase in the number of shares of common stock to 173,251 that the Series E Preferred Stock may be converted into.

In the event of a liquidation, dissolution or winding up of the Company, each share of Series E preferred stock will be entitled to a per share preferential payment equal to the stated value. There is no further adjustment required by the Series E Certificate of Designations in the event of an offering of shares below $14.43 per share by the Company.

**Series F Preferred Stock**
As of December 31, 2017, and 2016, there were no shares and 665,281 shares, respectively, of Series F Preferred Stock issued and outstanding. Shares outstanding as of December 31, 2016 were convertible into 221,761 shares of common stock. These shares were exchanged for Series L Preferred Stock in connection with the Exchange Agreement.

On August 16, 2016, we filed a Certificate of Designations, Preferences and Rights of the 0% Series F Convertible Preferred Stock with the Delaware Secretary of State, designating 1,559,252 shares of preferred stock as 0% Series F Preferred Stock. The shares of Series F Preferred Stock were convertible into shares of common stock based on a conversion calculation equal to the stated value of such Series F Preferred Stock, plus all accrued and unpaid dividends, if any, on such Series F Preferred Stock, as of such date of determination, divided by the conversion price. The stated value of each share of Series F Preferred Stock is $4.81 and the initial conversion price is $14.43 per share, each subject to adjustment for stock splits, stock dividends, recapitalizations, combinations, subdivisions or other similar events. In the event of a liquidation, dissolution or winding up of the Company, each share of Series F Preferred Stock was entitled to a per share preferential payment equal to the par value. All shares of the Company's capital stock were junior in rank to Series F Preferred Stock with respect to the preferences as to dividends, distributions and payments upon the liquidation, dissolution and winding-up of the Company, except for the Company's Series D Preferred Stock and Series E Preferred Stock.

The holders of Series F Preferred Stock were entitled to receive dividends if and when declared by our Board of Directors. The Series F Preferred Stock had the ability to participate on an "as converted" basis, with all dividends declared on the Company's common stock. In addition, if we had granted, issued or sold any rights to purchase our securities pro rata to all our record holders of our common stock, each holder was entitled to acquire such securities applicable to the granted purchase rights as if the holder had held the number of shares of common stock acquirable upon complete conversion of all Series F Preferred Stock then held.

We were prohibited from effecting a conversion of the Series F Preferred Stock to the extent that, as a result of such conversion, the holder would beneficially own more than 4.99% of the number of shares of common stock outstanding immediately after giving effect to the issuance of shares of common stock upon conversion of the Series F Preferred Stock, which beneficial ownership limitation may be increased by the holder up to, but not exceeding, 9.99%. Each holder was entitled to vote on all matters submitted to stockholders of

the Company and would have had the number of votes equal to the number of shares of common stock issuable upon conversion of such holder's Series F Preferred Stock, but not in excess of the beneficial ownership limitations.

**Series G Preferred Stock**

As of December 31, 2017, and 2016, there were no shares of our Series G Preferred Stock issued and outstanding. On May 19, 2017, we closed a public offering of 1,000,000 shares of newly designated 0% Series G Convertible Preferred stock; however, on October 17, 2017, these shares were exchanged for our Series L Preferred Stock in connection with the Exchange Agreement.

Pursuant to a Series G Preferred Stock Certificate of Designations, on May 15, 2017, we designated 5,000,000 shares of our blank check preferred stock as Series G Preferred Stock, par value of $0.01 per share. The shares of Series G Preferred Stock were convertible into shares of common stock based on a conversion calculation equal to the stated value of the of such Series G Preferred Stock, plus all accrued and unpaid dividends, if any, on such Series G Preferred Stock, as of such date of determination, divided by the conversion price. The stated value of each share of Series G Preferred Stock is $1.75 and the initial conversion price is $5.25 per share, each subject to adjustment for stock splits, stock dividends, recapitalizations, combinations, subdivisions or other similar events. The holder of a majority of the Series G Preferred Stock had the right to nominate a candidate for the Board, such right to expire on December 31, 2017.

In the event of a liquidation, dissolution or winding up of the Company, each share of Series G Preferred Stock was entitled to a per share preferential payment equal to the par value. All shares of our capital stock were junior in rank to Series G Preferred Stock with respect to the preferences as to dividends, distributions and payments upon the liquidation, dissolution and winding-up of the Company, except for the Company's Series D Preferred Stock, Series E Preferred Stock and Series F Preferred Stock. The holders of Series G Preferred Stock were entitled to receive dividends if and when declared by our Board of Directors. The Series G Preferred Stock were entitled to participate on an "as converted"basis, with all dividends declared on our common stock. In addition, if we had granted, issued or sold any rights to purchase our securities pro rata to

all our record holders of our common stock, each holder was entitled to acquire such securities applicable to the granted purchase rights as if the holder had held the number of shares of common stock acquirable upon complete conversion of all Series G Preferred Stock then held.

We were prohibited from effecting a conversion of the Series G Preferred Stock to the extent that, as a result of such conversion, the holder would beneficially own more than 4.99% of the number of shares of common stock outstanding immediately after giving effect to the issuance of shares of common stock upon conversion of the Series G Preferred Stock, which beneficial ownership limitation may be increased by the holder up to, but not exceeding, 9.99%. Each holder was entitled to vote on all matters submitted to stockholders of the Company and would have had the number of votes equal to the number of shares of common stock issuable upon conversion of such holder's Series G Preferred Stock, but not in excess of the beneficial ownership limitations.

**Series H Preferred Stock**
As of December 31, 2017 and 2016, there were no shares of our Series H Preferred Stock issued and outstanding. On May 3, 2017 we closed a private placement of 850 shares; however, these shares were exchanged for our Series L Preferred Stock in connection with the Exchange Agreement.

Pursuant to a Series H Preferred Stock Certificate of Designations, on May 3, 2017, we designated 2,000 shares of our blank check preferred stock as Series H Preferred Stock, par value of $0.01 per share. The shares of Series H Preferred Stock were convertible into shares of common stock based on a conversion calculation equal to the stated value of the Series H Preferred Stock, plus the base amount, if any, on such Series H Preferred Stock, as of such date of determination, divided by the conversion price.

The stated value of each share of Series H Preferred Stock was $1,000 and the initial conversion price was $5.25 per share, each subject to adjustment for stock splits, stock dividends, recapitalizations, combinations, subdivisions or other similar events.
In the event of a liquidation, dissolution or winding up of the Company, each share of Series H Preferred Stock was entitled to a per

share preferential payment equal to the base amount. All shares of our capital stock were junior in rank to Series H Preferred Stock with respect to the preferences as to dividends, distributions and payments upon the liquidation, dissolution and winding-up of the Company other than Series A through G Preferred Stock. The holders of Series H Preferred Stock were entitled to receive dividends if and when declared by our Board of Directors. The Series H Preferred Stock holders were entitled to participate on an "as converted" basis, with all dividends declared on our common stock. In addition, if we granted, issued or sold any rights to purchase our securities pro rata to all our record holders of our common stock, each holder was entitled to acquire such securities applicable to the granted purchase rights as if the holder had held the number of shares of common stock acquirable upon complete conversion of all Series H Preferred Stock then held.

We were prohibited from effecting a conversion of the Series H Preferred Stock to the extent that, as a result of such conversion, the holder would beneficially own more than 4.99% of the number of shares of common stock outstanding immediately after giving effect to the issuance of shares of common stock upon conversion of the Series H Preferred Stock, which beneficial ownership limitation may be increased by the holder up to, but not exceeding, 9.99%. Each holder was entitled to vote on all matters submitted to stockholders of the Company, and would have had the number of votes equal to the number of shares of common stock issuable upon conversion of such holder's Series H Preferred Stock, but not in excess of the beneficial ownership limitations.

**Series I Preferred Stock**
As of December 31, 2017 and 2016, there were 798,460 and no shares of our Series I convertible preferred stock (the "Series I Preferred Stock") issued and outstanding and convertible into 266,154 and no shares of our common stock, respectively.

Pursuant to a Series I Preferred Stock Certificate of Designations, on May 26, 2017, we designated 1,968,664 shares of our blank check preferred stock as Series I Preferred Stock, par value of $0.01 per share.

Each share of Series I Preferred Stock has a stated value of $0.01 per share. In the event of a liquidation, dissolution or winding up of the

Company, each share of Series I Preferred Stock will be entitled to a per share preferential payment equal to the stated value. Each share of Series I Preferred Stock is convertible into one-third share of common stock. The conversion ratio is subject to adjustment in the event of stock splits, stock dividends, combination of shares and similar recapitalization transactions. The Company is prohibited from effecting the conversion of the Series I Preferred Stock to the extent that, as a result of such conversion, the holder beneficially owns more than 4.99%, in the aggregate, of the issued and outstanding shares of the Company's Common Stock calculated immediately after giving effect to the issuance of shares of Common Stock upon the conversion of the Series I Preferred Stock (the "Beneficial Ownership Limitation"), which beneficial ownership limitation may be increased by the holder up to, but not exceeding, 9.99%. Each share of Series I Preferred Stock entitles the holder to vote on all matters voted on by holders of Common Stock. With respect to any such vote, each share of Series I Preferred Stock entitles the holder to cast such number of votes equal to the number of shares of Common Stock such shares of Series I Preferred Stock are convertible into at such time, but not in excess of the Beneficial Ownership Limitation.

**Series J Preferred Stock**

As of December 31, 2017, and December 31, 2016, there were 773 and no shares of our Series J Preferred Stock issued and On August 14, 2017, the Company filed a Certificate of Designations, Preferences and Rights of the 0% Series J Convertible Preferred Stock with the Delaware Secretary of State, designating 3,400 shares of preferred stock as Series J Preferred Stock. The shares of Series J Preferred Stock are convertible into shares of common stock based on a conversion calculation equal to the stated value of the Series J Preferred Stock, plus all accrued and unpaid dividends, if any, on such Series J Preferred Stock, as of such date of determination, divided by the conversion price. The stated value of each share of Series J Preferred Stock is $550 and the initial conversion price is $1.65 per share, each subject to adjustment for stock splits, stock dividends, recapitalizations, combinations, subdivisions or other similar events.

For so long as the holder has Series J Preferred Stock, if the Company sells, or is deemed to have sold, common stock, or common equivalent shares, for consideration per share less than the conversion price in effect immediately prior to the issuance (the "Lower Issuance Price"), then the conversion price in effect immediately prior to such

issuance will be adjusted to the Lower Issuance Price, provided however the Lower Issuance Price shall not be less than $0.03.

The holders of Series J Preferred Stock will be entitled to receive dividends if and when declared by our Board of Directors. The Series J Preferred Stock shall participate on an "as converted" basis, with all dividends declared on our common stock. In addition, if we grant, issue or sell any rights to purchase our securities pro rata to all our record holders of our common stock, each holder will be entitled to acquire such securities applicable to the granted purchase rights as if the holder had held the number of shares of common stock acquirable upon complete conversion of all Series J Preferred Stock then held.

We are prohibited from effecting a conversion of the Series J Preferred Stock to the extent that, as a result of such conversion, the holder would beneficially own more than 4.99% of the number of shares of common stock outstanding immediately after giving effect to the issuance of shares of common stock upon conversion of the Series J Preferred Stock, which beneficial ownership limitation may be increased by the holder up to, but not exceeding, 9.99%. Each holder is entitled to vote on all matters submitted to stockholders of the Company, and shall have the number of votes equal to the number of shares of common stock issuable upon conversion of such holder's Series J Preferred Stock, substituting the consolidated closing bid price of the common stock on August 10, 2017 for the then-applicable conversion price, and not in excess of the beneficial ownership limitations.

The Company shall not be obligated to issue any shares of common stock upon conversion of the Series J Preferred Stock, and the holder of any shares of Series J Preferred Stock shall not have the right to receive upon conversion of any shares of the Series J Preferred Stock if the issuance of such shares of common stock would exceed the aggregate number of shares of common stock which the Company may issue upon conversion of the Series J Preferred Stock without breaching the Company's obligations under the rules or regulations of The NASDAQ Capital Market, which aggregate number equals 19.99% of the number of shares outstanding on the closing date, except that such limitation shall not apply in the event that the Company obtains the approval of its stockholders as required by the applicable rules of The NASDAQ Capital Market for issuances of

common stock in excess of such amount. Such approval was obtained in October 2017.

Holders of Series J Preferred Stock will be entitled to a preferential payment of cash per share equal to the greater of 125% of the base amount on the date of payment or the amount per share had the holders converted such preferred shares immediately prior to the date of payment upon the liquidation, dissolution or winding up of the affairs of the Company, or a consolidation or merger of the Company with or into any other corporation or corporations, or a sale of all or substantially all of the assets of the Company, or the effectuation by the Company of a transaction or series of transactions in which more than 50% of the voting shares of the Company is disposed of or conveyed.

**Series K Preferred Stock**

As of December 31, 2017 and 2016, there were 63,150 and no shares, respectively, of our Series K convertible preferred stock ("Series K Preferred Stock") issued and outstanding and convertible into 2,105,000 and no shares of our common stock, respectively. On August 14, 2017, the Company filed a Certificate of Designations, Preferences and Rights of the Series K Convertible Preferred Stock with the Delaware Secretary of State, designating 65,000 shares of preferred stock as Series K Preferred Stock. The shares of Series K Preferred Stock are convertible into shares of common stock based on a conversion calculation equal to the stated value of the Series K Preferred Stock divided by the conversion price. The stated value of each share of Series K Preferred Stock is $0.01 and the ini tial conversion price is $0.0003 per share, each subject to adjustment for stock splits, stock dividends, recapitalizations, combinations, subdivisions or other similar events.

The holders of Series K Preferred Stock will be entitled to receive dividends if and when declared by our Board of Directors. The Series K Preferred Stock shall participate on an "as converted" basis, with all dividends declared on our common stock. In addition, if we grant, issue or sell any rights to purchase our securities pro rata to all our record holders of our common stock, each holder will be entitled to acquire such securities applicable to the granted purchase rights as if the holder had held the number of shares of common stock acquirable upon complete conversion of all Series K Preferred Stock then held.

We are prohibited from effecting any conversion of the Series K Preferred Stock if the Company has not obtained shareholder approval for the full conversion of the Series J Preferred Stock and Series K Preferred Stock in accordance with the rules of The NASDAQ Capital Market or to the extent that, as a result of such conversion, the holder would beneficially own more than 4.99% of the number of shares of common stock outstanding immediately after giving effect to the issuance of shares of common stock upon conversion of the Series K Preferred Stock, which beneficial ownership limitation may be increased by the holder up to, but not exceeding, 9.99%. Each holder is entitled to vote on all matters submitted to stockholders of the Company, and shall have the number of votes equal to the number of shares of common stock issuable upon conversion of such holder's Series K Preferred Stock, substituting the consolidated closing bid price of the common stock on August 10, 2017 for the then-applicable conversion price, and not in excess of the beneficial ownership limitations. Such approval was obtained in October 2017.

**Series L Preferred Stock**

As of December 31, 2017 and 2016, there were 58,000 and no shares of our Series L Preferred Stock issued and outstanding and convertible into 3,222,223 and no shares of our common stock, respectively. On October 16, 2017, we filed a Certificate of Designations, Preferences and Rights of the 0% Series LConvertible Preferred Stock (the "Series L Certificate of Designation") with the Delaware Secretary of State, designating 58,000 shares of preferred stock as Series L Preferred Stock. On October 18, 2017, we filed a Certificate of Correction to the Series LCertificate of Designation to include a sentence that was inadvertently omitted. The shares of Series L Preferred Stock are convertible into shares of common stock based on a conversion calculation equal to the stated value of the Series L Preferred Stock, plus all accrued and unpaid dividends, if any, on such Series L Preferred Stock, as of such date of determination, divided by the conversion price. The stated value of each share of Series L Preferred Stock is $100 and the initial conversion price is $1.80 per share, each subject to adjustment for stock splits, stock dividends, recapitalizations, combinations, subdivisions or other similar events. The holders of Series L Preferred Stock will be entitled to receive dividends if and when declared by our Board of Directors. The Series L Preferred Stock shall participate on an "as converted"basis, with all dividends declared on our common stock. In addition, if the Company

grants, issues or sells any rights to purchase its securities pro rata to all record holders of common stock, each holder will be entitled to acquire such securities applicable to the granted purchase rights as if the holder had held the number of shares of common stock acquirable upon complete conversion of all Series L Preferred Stock then held.

We are prohibited from effecting a conversion of the Series L Preferred Stock if the Company has not obtained stockholder approval for the full conversion of the Series L Preferred Stock in accordance with the rules of The NASDAQ Capital Market or to the extent that, as a result of such conversion, the holder would beneficially own more than 4.99% of the number of shares of common stock outstanding immediately after giving effect to the issuance of shares of common stock upon conversion of the Series L Preferred Stock, which beneficial ownership limitation may be increased by the holder up to, but not exceeding, 9.99%. Each holder is entitled to vote on all matters submitted to stockholders of the Company, and shall have the number of votes equal to the number of shares of common stock issuable upon conversion of such holder's Series L Preferred Stock, substituting the consolidated closing bid price of the common stock on October 13, 2017, for the then-applicable conversion price, and not in excess of the beneficial ownership limitations or limitations required by the rules and regulations of The NASDAQ Capital Market.

Holders of Series L Preferred Stock will be entitled to a preferential payment of cash per share equal to the greater of 100% of the base amount representing the sum of the stated value and any unpaid dividends, or the Base Amount, on the date of payment or the amount per share had the holders converted such preferred shares immediately prior to the date of payment upon the liquidation, dissolution or winding up of the affairs of the Company, or a consolidation or merger of the Company with or into any other corporation or corporations, or a sale of all or substantially all of the assets of the Company, or the effectuation by the Company of a transaction or series of transactions in which more than 50% of the voting shares of the Company is disposed of or conveyed.

**Warrants Issued in Connection with April 2015 Private Placement**

As of December 31, 2017, there were no warrants outstanding in connection with the April 2015 Private Placement as all of the warrants expired on October 10, 2017. As of December 31, 2016, there were warrants outstanding to purchase 268,454 shares of common stock at $33.30 per share. The warrants priced at $33.30 and $6.00 per share were remaining from our private offering in March and April 2015 (the "April 2015 Private Placement") in which we sold $8,546,348 worth of units (the "Units"), net of $668,150 in issuance costs, of which $2,500,000 of the Units consisted of Series E Preferred Stock and the balance consisted of 553,424 shares of common stock, together with warrants to all investors to purchase 351,787 shares of common stock at $33.30 per share. Each Unit was sold at a purchase price of $16.65 per Unit. OPKO Health, Inc., the lead investor in the April 2015 Private Placement, purchased $2,500,000 worth of Units consisting all the shares of the Series E Preferred Stock.

In connection with the May 2017 Public Offering, the Company had agreed to amend the terms of a portion of the outstanding warrants, or warrants to purchase 108,108 shares of common stock that had an exercise price of $33.30 per share, such that the amended warrants shall have an exercise price of $6.00 per share and no cashless exercise feature, for those investors who made a certain minimum required investment to qualify for repricing. After the repricing, the stock price never reached above $6.00 in order for the warrants to be exercised prior to the expiration date of October 10, 2017.

**Warrants Issued in Connection with October 2015 Public Offering**

As of December 31, 2017 and 2016, there were warrants outstanding to purchase 56,307 shares of common stock at $29.31 per share in connection with a public offering on October 5, 2015. The warrants at $29.31 per share were issued in connection with our public offering on October 5, 2015, which consisted of 112,613 shares of common stock and warrants to purchase 56,307 shares of common stock, at an offering price of $2.71 per share. For every two shares of common stock sold, the Company issued one warrant to purchase one share of common stock. We received $2,750,000 in gross proceeds, before

underwriting discounts and commissions and offering expenses totaling approximately $586,608.

The shares and warrants were separately issued and sold in equal proportions. The warrants are immediately exercisable, expire September 30, 2018, and have an exercise price of $29.31 per share. The warrants are not listed on any securities exchange or other trading market.

\*\*\*

The Company is obligated to issue an aggregate of 350,000 options to certain employees and members of the Board, at a price not less than $6.00 per share, and 16,667 options to each other Board member at the current market price in connection with this offering. The options shall be issued pursuant to the Company's option plan and are subject to the requisite approvals and subject to availability under the plan. To the extent we need to increase the number of shares available under such plan, we will need the approval of our Board and Stockholders. All Board fees will be waived for 2017.

\*\*\*

Additionally we granted the Lead Investor in the May 2017 Public Offering certain rights to approve future (i) issuances of our securities, (ii) equity or debt financings and (iii) sales of any development product assets currently held by us, subject to certain exceptions, if such securities are sold at price below $7.50 per share and for as long as the Lead Investor in the offering holds 50% or more of the shares of Series G Preferred Stock purchased by the Lead Investor in this offering (the "May 2017 Consent Right"). All other prior consent rights of the Lead Investor have been superseded by the May 2017 Consent Right.

\*\*\*

We conducted an evaluation of the effectiveness of internal control over financial reporting based on the framework in *Internal Control — Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, our principal executive officer and principal financial officer conclude that, at December 31, 2017, our internal controls over financial reporting were effective.

24.     The statements referenced above in ¶¶ 23 were materially false and/or misleading when made because Defendants failed to disclose: (1) that the Company's internal controls over financial reporting were materially weak and deficient; (2) that the Company had incorrectly calculated and reported beneficial ownership of MabVax shares and permitted improper influence or control over MabVax, and/or the Company's officers and directors by certain shareholders; and, (3) that, as a result of the foregoing, the Company's financial statements and Defendants' statements about MabVax's business, operations, and prospects, were materially false and misleading at all relevant times.

## THE TRUTH IS REVEALED

25.     On May 21, 2018, the Company filed an 8-K with the SEC disclosing more details regarding the SEC investigation into the Company and its officers and directors potential violation of federal securities laws, as well as an investigation into potential violations of securities laws by various holders of the Company's securities. The Company stated in relevant part:

> We believe the SEC is investigating (i) potential violations by the Company and its officers, directors and others of Section 10(b) of the Securities and Exchange Act of 1934, as amended (as amended, the "Exchange Act") and Section 17(a) of the Securities Act of 1933, as amended (as amended, the "Securities Act"); and (ii) potential violations by multiple holders of our preferred stock of the reporting and disclosure requirements imposed by Section 13(d) of the Exchange Act and pursuant to Schedules 13D and 13G. We further believe the SEC Investigation pertains to our relationships with multiple of those holders of our preferred stock, including (i) the

circumstances under which those stockholders invested in the Company and whether they have acted as an undisclosed group in connection with their investment; (ii) the manner with or in which those stockholders may have sought to control or influence the Company and its leadership since their respective investments (and the extent to which those efforts to control or influence have been successful); and (iii) our prior disclosures regarding the control of the Company and beneficial ownership of our common and preferred stock included in our registration statements filed in 2017 and 2018 and in our Exchange Act reports. In light of the SEC Investigation, we have also reviewed facts and circumstances related to our recently completed May 2018 offering and publicly available information concerning certain of our stockholders' relationships with other registrants.

We have cooperated with the SEC in connection with the SEC Investigation, and our Board of Directors has appointed a Special Committee comprised of independent members of our Board of Directors to supervise the Company's review of the matters believed to be under investigation. However, we cannot predict when the SEC Investigation will conclude, nor whether it will conclude in a manner adverse to the Company, any of its directors and officers, or its current or former stockholders. We also cannot predict, how the SEC Investigation or any related matters may impact how the Company is perceived by the market, potential partners and potential investors in our securities. We do not believe that the SEC would declare effective any registration statements registering our securities effective during the pendency of the SEC Investigation.

Historically, we have calculated and reported beneficial ownership in reliance upon the accuracy of the beneficial ownership reporting of our stockholders, including reports filed on Schedules 13D and 13G and information provided by these stockholders directly to us. We have similarly relied on the accuracy of stockholder-reported beneficial ownership when effecting conversions of shares of preferred stock. The SEC Investigation and our review of the matters under investigation (including information learned recently) has raised questions about the accuracy of those reports by those holders, including their past disclaimers of having not acted as a group with respect to their investment in the Company. If certain stockholders have indeed acted as a group, their respective beneficial ownership

interests should have been aggregated and reported in the aggregate in our prior beneficial ownership disclosures. If their holdings should have been so aggregated, then, due to the provisions of our organizational documents regarding the conversion limitations applicable to certain holders of our preferred stock, shares of our common stock may have been issued in violation of our organizational documents. If shares of our common stock were issued in violation of our organizational documents, then the number of shares of our outstanding common stock previously reported in our financial statements, registration statements and Exchange Act Reports may be inaccurate. Further, figures reported and included in our financial statements, registration statements and Exchange Act Reports in reliance on the number of our outstanding shares of common stock, including, but not limited to, our loss per share figures, may also be inaccurate. We are also reviewing our internal and disclosure controls.

26.     On this news the Company's shares fell $0.41 per share or over 23%, to close on May 21, 2018 at $1.36 per share.

## NO SAFE HARBOR

27.     Most of the false and misleading statements related to existing facts or conditions, and the Safe Harbor provisions have no applicability to such statements. To the extent that known trends should have been included in the Company's financial reports prepared in accordance with GAAP, they too are excluded from the protection of the statutory Safe Harbor.  15 U.S.C. §78u-5(b)(2)(A).

28.     MabVax's "Safe Harbor" warnings accompanying its reportedly forward-looking statements issued during the Class Period were also ineffective to shield those statements from liability.   Defendants Hansen and Hanson are liable for any false or misleading forward-looking statements because, at the time each

forward-looking statements was made, the speaker knew the forward-looking statements was false or misleading and the forward-looking statements was authorized and/or approved by an executive officer and/or director of MabVax who knew that the forward-looking statements was false.  In addition, the forward-looking statements were contradicted by existing, undisclosed material facts that were required to be disclosed so that the forward-looking statements would not be misleading.  Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.

## ADDITIONAL SCIENTER ALLEGATIONS

29.     As alleged herein, Defendants Hansen and Hanson acted with scienter in that each knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants Hansen and Hanson, by virtue of their receipt of information reflecting the true facts regarding MabVax, their control over, and/or receipt of modification of MabVax's allegedly materially misleading misstatements and/or his associations with the Company

which made them privy to confidential proprietary information concerning MabVax, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

30.     At all relevant times, the market for MabVax's common stock was an efficient market for the following reasons, among others:

(a)     MabVax's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     The Company had approximately 8,961,840 shares of common stock issued and outstanding as of April 2, 2018;

(c)     as a regulated issuer, MabVax filed periodic public reports with the SEC;

(d)     MabVax regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services, the Internet and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)     MabVax was followed by many securities analysts who wrote reports that were distributed during the Class Period.  Each of these reports was publicly available and entered the public marketplace; and

(f)     unexpected material news about MabVax was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

31.    As a result of the foregoing, the market for MabVax common stock promptly digested current information regarding MabVax from publicly available sources and reflected such information in MabVax's stock price.   Under these circumstances, all purchasers of MabVax common stock during the Class Period suffered similar injury through their purchase of MabVax common stock at artificially inflated prices, and a presumption of reliance applies.

## LOSS CAUSATION

32.    During the Class Period, as detailed herein, Defendants Hansen and Hanson made false and misleading statements, and omitted material information, concerning MabVax's business fundamentals and financial prospects and engaged in a scheme to deceive the market.

33.    By artificially inflating and manipulating MabVax's stock price, Defendants Hansen and Hanson deceived Plaintiff and the Class and caused them losses when the truth was revealed.   As a result of their purchases of MabVax securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

34.    This is a class action on behalf of those who purchased or otherwise acquired MabVax common stock between March 14, 2016 and May 18, 2018,

inclusive, excluding Defendants Hansen and Hanson (the "Class"). Also excluded from the Class are officers and directors of the Company as well as their families and the family of Defendants Hansen and Hanson. Class members are so numerous that joinder of them is impracticable.

35.     Common questions of law and fact predominate and include whether Defendants Hansen and Hanson: (a) violated the Exchange Act; (b) omitted and/or misrepresented material facts; (c) knew or recklessly disregarded that their statements were false; (d) artificially inflated the price of MabVax common stock; and (e) the extent of and appropriate measure of damages.

36.     Plaintiff's claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiff will adequately protect the interests of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

37.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

38.     Throughout the Class Period, Defendants MabVax, Hansen and Hanson, in pursuit of their scheme and continuous course of conduct to inflate the market price of MabVax common stock, had the ultimate authority for making, and

knowingly or recklessly made, materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

39.    During the Class Period, Defendants MabVax, Hansen and Hanson, and each of them, carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and, throughout the Class Period did: (a) artificially inflate and maintain the market price of MabVax common stock; (b) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (c) cause Plaintiff and other members of the Class to purchase MabVax common stock at inflated prices; and (d) cause them losses when the truth was revealed.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants MabVax, Hansen and Hanson took the actions set forth herein, in violation of §10(b) of the Exchange Act and Rule 10b-5, 17 C.F.R. §240.10b-5.

40.    In addition to the duties of full disclosure imposed on Defendants MabVax, Hansen and Hanson as a result of their affirmative false and misleading statements to the investing public, these Defendants had a duty to promptly disseminate truthful information with respect to MabVax's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market price of the Company's securities would be

based on truthful, complete and accurate information.  SEC Regulations S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*).

41.   Defendants MabVax, Hansen and Hanson had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were either known or readily available to them.

42.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market price of MabVax common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of MabVax common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made knowingly or with deliberate recklessness by Defendants MabVax, Hansen and Hanson, or upon the integrity of the market in which the shares traded, Plaintiff and other members of the Class purchased MabVax stock during the Class Period at artificially high prices and, when the truth was revealed, were damaged thereby.

43.   Had Plaintiff and the other members of the Class and the marketplace known of the true facts, which were knowingly or recklessly concealed by Defendants MabVax, Hansen and Hanson, Plaintiff and the other members of the Class would not have purchased or otherwise acquired their MabVax shares during the Class Period, or if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

44.   By virtue of the foregoing, Defendants MabVax, Hansen and Hanson have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. 17 C.F.R. §240.10-5.

## COUNT II

**For Violation of Section 20(a) of the Exchange Act
Against the Individual Defendants**

45.   Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

46.   Defendants Hansen and Hanson had control over MabVax and made the material false and misleading statements and omissions on behalf of MabVax within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their executive positions and stock ownership, as alleged above, Defendants Hansen and Hanson had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends were false and misleading.  Defendants Hansen and Hanson were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

47.     In particular, Defendants Hansen and Hanson had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

48.     By reason of such wrongful conduct, Defendants Hansen and Hanson are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of Defendants Hansen's and Hanson's wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  June 4, 2018                          **GLANCY PRONGAY & MURRAY LLP**

By:  *s/ Lesley F. Portnoy*
Lionel Z. Glancy
Robert V. Prongay
Lesley F. Portnoy
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:   (310) 201-9160
Email: lportnoy@glancylaw.com

**HOLZER & HOLZER LLC**
Corey D. Holzer
1200 Ashwood Parkway, Suite 410
Atlanta, Georgia  30338
Telephone: (770) 392-0090
Facsimile:  (770) 392-0029
Email: cholzer@holzerlaw.com

*Attorneys for Plaintiff*

DocuSign Envelope ID: 4AO79066-8654-49DD-AEB6-604917F9SAB6

### CERTIFICATION OF NAMED PLAINTIFF
### PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned declares, as to the claims asserted under the federal securities laws, that:

       Plaintiff has reviewed the initial complaint filed in this action.

       Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

       Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.  I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

       Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows:

       Purchases:

| Name of Company | Date(s) Purchased | # Shares Purchased | Cost/Share |
|---|---|---|---|
| MBVX | 11/04/2016 | 100 | $3.8929 |
| | 11/04/2016 | 442 | $3.8970 |
| | 11/04/2016 | 100 | $3.8828 |
| | 11/04/2016 | 700 | $3.8596 |
| | 11/04/2016 | 100 | $3.8626 |
| | 11/14/2016 | 1,130 | $4.4591 |

       Sales:

| Name of Company | Date(s) Sold | # Shares Sold | Proceeds/Share |
|---|---|---|---|
| MBVX | | | |

       During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

 None

Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _____1_____ day of ____June____, 2018 in __Walsall, West Midlands__, ____England____.

City                          State

(Signature) X_____

(Print Name)_____Liam Hardy_____